**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHERYL VERDONE | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| | : | JURY TRIAL DEMAND |
| GREENLEAF BIOFUELS, LLC | : | |
| KOLMAR AMERICAS, INC. and | : | |
| AMERICAN GREENFUELS, LLC | : | |
| | : | |
| Defendants. | : | July 27, 2016 |

## COMPLAINT

### Introduction

1.      This case concerns the repeated refusal of the Defendants to pay the Plaintiff, Cheryl Verdone ("Plaintiff"), a wage commensurate with her responsibilities, and equal to that of her male counterparts, on the basis of her sex and disability.  After Plaintiff's repeated requests for a raise and fair and equal compensation, and after learning that Plaintiff had called the CHRO to investigate her rights, Defendants forced Plaintiff out of her employment by, first, revoking their provision of reasonable accommodation for her disability, and eventually terminating her employment.

2.      Defendants' sole "rationale" for its repeated discrimination was that the requisite "funds were not in the budget."  Defendants' actions were clearly pretextual, as Defendants have a pattern of exclusively hiring men for management positions with high salaries, excluding women from management, and paying women less than fair compensation for their work.

## PARTIES

3.    Plaintiff is an individual residing in Sparks, Nevada.

4.    Plaintiff is female, and suffers from multiple sclerosis ("MS"), a chronic autoimmune disorder affecting the central nervous system.

5.    At all times relevant to this Complaint, Plaintiff was a single mother of two young children, and resided in Milford, Connecticut.

6.    Defendant Greenleaf Biofuels, LLC ("Greenleaf") is a Connecticut limited liability company with its principal place of business at 100 Waterfront Street, New Haven, CT 06512.

7.    Defendant Kolmar Americas, Inc. ("Kolmar") is a Delaware corporation with its principal place of business at 10 Middle Street, Bridgeport, Connecticut 06604.

8.    Defendant American Greenfuels, LLC ("American Greenfuels") is a Delaware limited liability company with its principal place of business at 10 Middle Street, Bridgeport, Connecticut 06604.

### Kolmar Made the Final Decision on all Employment Matters at Greenleaf

9.    At all times relevant to this Complaint, Greenleaf produced and sold biodiesel, which is a form of fuel created from feedstock.  It employed approximately 25-28 employees.

10.    Kolmar supplied Greenleaf with feedstock, oversaw its production, and bought all biodiesel produced by Greenleaf.

11.    On or around January 2013, Kolmar began heavily investing in Greenleaf's assets and operations.  Over the next two years, Kolmar invested more than $8 million into the company.

2

12.    On or around January 2013, Kolmar took control of Greenleaf's corporate board and assumed responsibility for the business decisions of Greenleaf.

13.    Kolmar assumed control of Greenleaf's operations, management, and finances, imposing a commonality of hiring, firing, discipline, pay, insurance, records and supervision.

14.    Kolmar's consent and funding was an integral element of Greenleaf's labor relations.

15.    Kolmar was the final decision maker for all employment matters at Greenleaf, including but not limited to, employee hiring and firing determinations.  Kolmar managed and supervised employees at Greenleaf, and set production and review standards.

16.    Kolmar assumed control over the payment of employees at Greenleaf, and made the final determination concerning wages and benefits of employees at Greenleaf.

17.    Upon information and belief, Kolmar employs at least one hundred employees.

### Merger of Greenleaf and American Greenfuels

18.    Greenleaf merged with American Greenfuels on or around December 15, 2015.

19.    Kolmar is a member of American Greenfuels.

20.    Pursuant to General Statutes § 34-197, American Greenfuels is responsible and liable for all liabilities and obligations of Greenleaf.

21.    Upon information and belief, American Greenfuels employs more than fourteen employees.

### JURISDICTION & VENUE

22.    This Court has jurisdiction pursuant to both 28 U.S.C. § 1331 and 28 U.S.C. § 1332(a)(2) as:  1) Plaintiff asserts a claim under federal law and 2) there is complete diversity of

citizenship and the amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

23.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as Plaintiff's federal cause of action arises out of the same facts and circumstances as does the state cause of action.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in the State of Connecticut.

## FACTS

### Plaintiff's Disability

25.    Plaintiff was diagnosed with MS in 1999, and since that date has been receiving regular medical treatment to control and manage the disease.

26.    MS is a permanent disability of the central nervous system that manifests itself in a range of mental and physical symptoms.  In particular, Plaintiff suffers from exhaustion, pain, stiffness and/or shaking in the morning.  She also occasionally suffers a "flare up" of the disease, which generally manifests itself in the form of painful migraines and/or muscle spasms in the neck, back and legs, that limit mobility and/or vision and result in slightly slurred speech.

27.    With reasonable accommodation, Plaintiff is able to and was performing the essential functions required of her by the Defendants, including the essential functions of a director of human resources.

## Plaintiff's Professional Experience & Credentials

28.    Plaintiff has twenty years of experience in high-level management, human resources, and marketing.  She graduated *cum laude* from the University of Connecticut, Storrs, with a BA in business administration.

29.    From 2000 until 2008, Plaintiff served as Vice President of Human Resources & Marketing at a start-up sales company, where she managed the company's human resources and marketing matters, and earned an annual salary of approximately $208,000.

30.    From 2008 until 2011, Plaintiff provided independent consulting on human resources matters to corporations in Connecticut, independent consulting on marketing matters to corporations in Florida and Arizona, and ghost-writing services to clients in several states.  Her hourly rate was never less than $50.00.

## Plaintiff Joined Greenleaf to Participate in an Energy Start-Up Company

31.    Greenleaf hired Plaintiff as an independent contractor in February 2012.

32.    Greenleaf hired Plaintiff at a wage of $25.00/hour.

33.    When Plaintiff was hired in February 2012, Greenleaf was managed by Mark McCall (hereinafter "McCall") and Gus Kellogg (hereinafter "Kellogg"), and had only one other employee.

34.    Plaintiff was hired to an administrative position as an office assistant.  Plaintiff's primary job responsibilities were to provide office support assignments, such as data entry and filing.

35.    Plaintiff chose to join Greenleaf because of the potential that she saw in the position: she was told at her interview that the company would be growing and that she "would benefit" from its growth.

5

36.     When Plaintiff began working with Greenleaf, she requested and was provided with reasonable accommodation for her disability.  Specifically, she requested and was allowed to begin her workday later in the morning (around 10 a.m.) on days when her symptoms were worse.  This provided the benefit of allowing her to gain control over her symptoms in the morning so that she could safely drive to work, maintain energy throughout the day, and when necessary, work with the employees on the night shift.

37.     Plaintiff worked between 30 and 35 hours a week, and successfully performed all of her job responsibilities within those hours.  She was also available telephonically to all managers and employees 24 hours per day, seven days per week.

**Plaintiff Created Greenleaf's Human Resources Department and Managed all Human Resources Matters, including Regulatory Compliance and Grant Assistance**

38.     In April 2012, Greenleaf desired to hire a plant manager.  At that time, Greenleaf had few protocols for human resources matters, including a lack of any policies or procedures for the fluid hiring, firing, and retention of employees.  Due to Plaintiff's extensive experience in human resources, Plaintiff wrote the job description for the plant manager position and managed recruiting for the position.

39.     By June 2012, Plaintiff had become Greenleaf's resource for all human resources matters.  She was participating in all management meetings and discussions regarding human resources and other business matters.

40.     Plaintiff completely developed Greenleaf's human resources department, including, but not limited to:

(a) performed all recruiting, including all high-level recruiting;

(b) created and developed Greenleaf's employment policies and practices;

(c) created Greenleaf's employee benefits package;

(d) maintained employee personnel files, and ensured Greenleaf's compliance with state and federal laws governing the maintenance and retention of employee personnel files;

(e) managed all disciplinary matters;

(f) managed employee terminations;

(g) established employee training programs and ensured employee compliance;

(h) established rapport with employees and encouraged employee pride in their work and the success of the company;

(i) developed Greenleaf's modified DuPont schedule, and monitored and ensured compliance with that schedule; and,

(j) achieved designation of Greenleaf as a "Safety Sensitive" company for employees by the Connecticut Department of Labor.

41.    Plaintiff also crafted and managed applications to the Connecticut Department of Labor's Step-Up Grant Program.  She drafted all grant applications and successfully achieved the receipt of approximately $120,000 in grant awards for Greenleaf.

42.    Plaintiff handled all investigations of Greenleaf by the U.S. Department of Labor, Occupational Safety & Health Administration ("OSHA").  Greenleaf was the subject of two OSHA investigations that had the potential to shut-down operations.  Due to Plaintiff's diligence, those investigations resulted in either a small fine or no fine to the company.

## Defendants' Discrimination

43.    On or around January 1, 2013, Plaintiff became an employee of the company and received a small pay increase to $28.00/hour.

44.    Plaintiff contested the small size of the pay increase, and requested a salary comparable to that of a human resources director because of her experience, her increased responsibilities, and her value to the company for human resources.

45.    Greenleaf denied her request on the basis that the funds were not in the budget.

46.    Greenleaf thereafter began to receive substantial financial investment from Kolmar. Kolmar took control of Greenleaf's corporate board and assumed responsibility for the business decisions of Greenleaf. Kolmar took over the payment of wages, and became the final decision maker for all employee hiring and firing determinations.

47.    Shortly after Kolmar began investing in the company, Plaintiff again requested a raise and a salary comparable to that of a human resources director.

48.    In response, McCall and Kellogg promised her a raise, but told her that at the moment the funds were not in the budget.

49.    In March 2013, at Defendants' request, Plaintiff recruited a "Quality Control Manager" and managed his hiring, including handling of all H-1 visa immigration paperwork. He was male, and took over parts of employee training and safety training, which had been Plaintiff's responsibility. He was hired at a base salary of $120,000 per year.

50.    In May 2013, Kolmar took over recruiting. Interviews were first conducted by a representative from Kolmar, and all hiring decisions were made by Kolmar.

51.    In June 2013, Kolmar appointed McCall as CEO of Greenleaf and Kellogg as COO. Both received substantial pay increases, to approximately $150,000 per year, for each.

52.    Near the end of the summer of 2013, the only other female employee of Greenleaf beside Plaintiff—the bookkeeper—left Greenleaf.

53.    After the bookkeeper's departure, Plaintiff was given a raise of $1.00/hour.

54.    For the year 2013, Plaintiff's gross income was approximately $44,000.

55.    In May 2014, McCall was terminated from Greenleaf due to management differences with Kolmar. Plaintiff managed all of the necessary documentation to ensure a smooth severance. After his smooth termination, Kellogg promised Plaintiff "the raise that she deserved," but then ignored Plaintiff's repeated emails following-up on his promise. Plaintiff did not receive a raise.

56.    Kolmar gave Kellogg a raise to a base salary of $180,000 per year.

57.    Immediately following McCall's termination, Kolmar hired Kevin Ovian (hereinafter "Ovian"), a male, as a "Business Director." Ovian's responsibilities were to include human resources; however, he had little experience in human resources. He was hired at a base salary of $150,000 per year.

58.    Hiring Ovian was a pretext for discrimination. Defendants created a new management position concerning human resources, and did not consider Plaintiff for that position, because Defendants did not want to pay a woman in management.

59.    Notwithstanding that Plaintiff was already doing the job of a human resources director, the Defendants handpicked Ovian for the position, in part, because of his gender and Plaintiff was not considered for or allowed to apply for this management position.

60.    Only two weeks after Ovian's hiring, it became evident in meetings, and through employee complaints, that Ovian had no experience in human resources.

61.    Plaintiff continued to manage human resources for the Defendants, including overseeing all human resources matters handled by Ovian. At this time Plaintiff earned approximately $31.00/hour.

62.    In the summer of 2014, Defendants hired a new plant manager, who was male. He was hired at a base salary of $140,000 per year.

63.    Around August 2014, Ovian began to take on human resources projects without Plaintiff's involvement. Plaintiff told Kellogg: "Well, I take it I'm not the head of HR any longer." He told her, emphatically, that it was not true and that her role had not changed in any way.

### Defendants' Retaliation and Revocation of Reasonable Accommodation for Plaintiff's Disability

64.    In August 2014, Defendants began to exclude Plaintiff from all high-level management meetings, including meetings related to human resources. Plaintiff continued to attend general management meetings.

65.    In all meetings, Ovian's behavior towards Plaintiff quickly became demeaning and aggressive. After the first meeting that Ovian was abusive to her, Plaintiff emailed Kellogg asking to meet with him to discuss the situation. He ignored her email. Following the meeting, and after witnessing Ovian's behavior, the plant manager reported Ovian's behavior to Kellogg. Defendants again did nothing.

66.    In August 2014, Kellogg told Plaintiff that the Defendants would no longer accommodate her disability. Defendants requested that Plaintiff arrive at work by 9:00am, and required Plaintiff to be at work no later than 9:30 a.m. Prior to this date, her arrival generally by 10 a.m. to accommodate her disability had never been an issue, or caused any detriment to the company or its employees.

67.    Plaintiff informed Kellogg that, as a result of her disability, an earlier arrival would aggravate her condition, and would be impossible on the mornings when her symptoms were not yet in control, as she would not be able to safely drive her car.

10

68.    Plaintiff requested reasonable accommodation twice regarding this matter.  Both times, Defendants denied her request.

69.    On or around August 2014, Plaintiff had an employee appraisal meeting with Kellogg.  Plaintiff asked him why she was not being given the raise that she had been promised. He told Plaintiff that the funds were not in the budget, which was clearly pretextual given the Defendants' practice of hiring men for management positions at high salaries.

70.    Kellogg told Plaintiff at the employee appraisal meeting that Plaintiff's work was excellent and that the decision to not grant her a raise had nothing to do with the quality of her work-product.

71.    On or around September 2014, Defendants hired a new chemical engineer, who was male.  He was hired at a base salary of $85,000 per year.

72.    Shortly after Defendants hired the chemical engineer, Plaintiff once again requested a salary commensurate to the market rate for a Director of Human Resources. Defendants denied her request for a raise.

73.    At this point, Plaintiff was ready to leave Defendants' employment, despite her personal responsibility to support two small children.  Plaintiff desired to leave her employment because of Defendants' repeated refusal to accommodate her disability, and to pay her a wage commensurate with her responsibilities and benefit to the Defendants, and equal to that of her male counterpart.

74.    Plaintiff approached Dan McFadden, a consultant hired by Kolmar to review Greenleaf, and complained that she was not receiving equal pay compared to her male counterparts, and that she was being excluded from management meetings and decisions related to human resources matters.  He told her to "hang in there" and that if she would "give him just

11

two weeks, [she] would see a major change." He stated that "everything was going to be completely different" and that she "was going to be included in everything regarding HR because [she] was the head of HR."

75.    Two weeks later, Plaintiff brought the matter up again to Dan McFadden, at which time he told her that Kolmar would not allow her to be included in anything. He stated that "the big boss [Rafi Aviner, President of Kolmar] put the kibosh on it" and that "sometimes people have a hard time looking in the mirror and seeing the truth."

76.    In October 2014, Kellogg told Plaintiff that she was to report to Ovian as her supervisor. Plaintiff considered this decision to be a demotion, and to be demeaning and humiliating.

77.    On or about October 2014, Plaintiff called the Connecticut Commission on Human Rights and Opportunities ("CHRO"), and left a message requesting information on filing a claim. She did not file a complaint with the CHRO. Plaintiff told Ovian that she intended to file a complaint with the CHRO concerning her unequal pay and the discrimination against her on the basis of her sex.

78.    Ovian told Plaintiff that "there was nothing he could do," and that she needed to go to Kellogg. Before Plaintiff could discuss it with Kellogg, he became cold, distant and unapproachable.

79.    Ovian began to tell Plaintff that she "clearly was miserable."

80.    Defendants then relocated Plaintiff's office to a trailer on the site of Greenleaf's refinery operations, which she considered to be demeaning and humiliating.

81.     Defendants' alienating behavior was clearly in retaliation for complaining about its persistent discrimination and for expressing her intent to pursue a discrimination claim with the CHRO.

82.     By November 2014, 26 of Greenleaf's 28 total employees were male.  All of the managers were male and had been hired by Kolmar.

83.     The only other female employee of Greenleaf held an administrative position as a Logistics Assistant and earned approximately $18/hour.

84.     Plaintiff's gross income for 2014 was $46,793.

**Defendants' Discriminatory and Retaliatory Termination of Plaintiff's Employment**

85.     Defendants' discriminatory and retaliatory conduct resulted in Plaintiff's termination on November 13, 2014.

86.     Plaintiff was told that she was being terminated because the company was reorganizing.  This alleged basis for her termination was a pretext for discrimination.

87.     Upon information and belief, Ovian assumed all of Plaintiffs' responsibilities after her termination, and received a raise from his $150,000 base salary.

88.     Defendants terminated Plaintiff's employment on the basis of her sex and disability, and in retaliation for complaining about the Defendants' discriminatory practices and investigating her rights with the CHRO.

89.     Defendants' hiring and compensation practices denied her a salary commensurate with her responsibilities and equal to that of her male counterparts, and denied her the opportunity to attain a management position.

90.     During the entirety of her employment with Defendants, the three women employed by Defendants were treated as administrative personnel regardless of their duties,

while all men in managerial roles were treated as management, and the entire management team was male.

## The CHRO Investigation

91.     On or about March 2, 2015, and within 180 days after the alleged unlawful employment practices detailed in this Complaint, Plaintiff filed a complaint against Defendants with the Connecticut Commission on Human Rights and Opportunities ("CHRO") asserting that she was denied a promotion and fair compensation on the basis of her sex and disability, was denied equal pay on the basis of her sex, was retaliated against for complaining about Defendants' discriminatory employment practices and investigating her rights with the CHRO, was denied reasonable accommodation of her disability, and was wrongfully terminated based on her age and disability.

92.     The filing of this complaint constituted a joint filing with the Equal Employment Opportunity Commission ("EEOC").

93.     The CHRO performed a Merit Assessment Review and retained Plaintiff's complaint for a full investigation.

94.     By letter dated May 2, 2016, Plaintiff requested that she be permitted to commence this litigation.

95.     The CHRO issued a Release of Jurisdiction on May 5, 2016, a date less than 90 days prior to the filing of this Complaint.

## COUNT ONE – TITLE VII, CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000e et. seq.) - DISCRIMINATION

96.     Plaintiff repeats and realleges paragraphs 1 through 95 of the Complaint as if fully set forth herein.

14

97. Plaintiff is a member of a protected class based on her sex.

98. Plaintiff was qualified and was in fact performing the duties asked of her by Defendants, including, but not limited to, the duties of a human resources director, due to her education and experience, her favorable performance reviews up until termination, and her accomplishments during employment of developing Greenleaf's human resources department and successfully handling high-level regulatory and grant issues on behalf of the company.

99. Defendants' sole basis for their refusal to provide fair and equal compensation, refusal to promote, and termination of Plaintiff, was purported lack of budgetary resources and reorganization, which was clearly pretextual given Kolmar's substantial financial investment in Greenleaf and Defendants' persistent and continuous hiring of male management at high salaries.

100. Defendants discriminated against Plaintiff with respect to her compensation, terms, conditions and privileges of employment in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a) ("Title VII") by refusing to promote Plaintiff to a management position on the basis of her sex.

101. Defendants discriminated against Plaintiff with respect to her compensation, terms, conditions and privileges of employment in violation of Title VII by refusing to give Plaintiff a raise to a wage commensurate with her responsibilities on the basis of her sex.

102. Defendants discriminated against Plaintiff with respect to her compensation, terms, conditions and privileges of employment in violation of Title VII by terminating Plaintiff on the basis of her sex.

103. By reason of the foregoing, Defendants deprived Plaintiff of certain benefits, privileges, terms and conditions of employment because of her sex, all to her damage and injury.

15

104. As a result of Defendants' discriminatory practices, Plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial. Plaintiff therefore is entitled to such affirmative relief as may be appropriate under Title VII.

105. Defendant's acts and/or omissions were intentional, without cause, and were calculated deliberately and with malice or with reckless indifference to Plaintiff's federally protected rights so as to entitle Plaintiff to an award of punitive damages.

**COUNT TWO – AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12101 et seq.)**

106. Plaintiff repeats and realleges paragraphs 1 through 95 of the Complaint as if fully set forth herein.

107. Plaintiff's MS is a physical and mental impairment that substantially limits one or more of Plaintiff's major life activities.

108. Defendants subjected Plaintiff to actions prohibited under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 et seq., by reason of actual or perceived physical impairment of Plaintiff by MS.

109. By refusing to provide reasonable accommodation for Plaintiff's disability, Defendants violated the ADA.

110. By discriminating against the Plaintiff on the basis of her disability in the privileges of employment, including advancement and compensation, Defendants violated the ADA.

111. Defendants violated the ADA by terminating Plaintiff on the basis of her disability and/or an unwillingness to further provide reasonable accommodation for her disability.

16

112.    As a result of Defendants' discriminatory practices, Plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial, and has suffered aggravation of her disability.  Plaintiff therefore is entitled to such affirmative relief as may be appropriate under the ADA.

113.    Defendant's acts and/or omissions were intentional, without cause, and were calculated deliberately and with malice or with reckless indifference to Plaintiff's federally protected rights so as to entitle Plaintiff to an award of punitive damages.

**COUNT THREE – VIOLATION OF EQUAL PAY ACT OF 1964 (29 U.S.C. § 206(d) <u>et.</u> <u>seq.</u>)**

114.    Plaintiff repeats and realleges paragraphs 1 through 95 of the Complaint as if fully set forth herein.

115.    At all relevant times, the Defendants were engaged in commerce, in the production of goods for commerce, or were part of an enterprise engaged in commerce or in the production of goods for commerce.

116.    During Plaintiff's employment, Defendants required Plaintiff to perform equal work as other male employees on jobs requiring equal skill, effort, and responsibility, and under similar working conditions at the same establishment.

117.    Defendants paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees, in violation of the Equal Pay Act, ("EPA") 29 U.S.C. § 206(d) *et seq.*

118.    By reason of the foregoing, Defendants deprived Plaintiff of equal pay because of her sex, all to her damage and injury.   Plaintiff is entitled to such affirmative relief as may be appropriate under the EPA, including liquidated damages pursuant to 29 U.S.C. § 216(b).

**COUNT FOUR** – TITLE VII, CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000e et. seq.) -
**RETALIATION**

119.    Plaintiff repeats and realleges paragraphs 1 through 95 of the Complaint as if fully set forth herein.

120.    Plaintiff engaged in a protected activity by complaining about Defendant's discriminatory employment practices and investigating her rights with the CHRO.

121.    Defendants were aware of Plaintiff's protected activities.

122.    After becoming aware of Plaintiff's engagement in protected activities, Defendants refused to provide Plaintiff with fair and equal compensation, refused to promote Plaintiff, and terminated Plaintiff in violation of Title VII, specifically 42 U.S.C. § 2000e-3.

123.    Defendants terminated and otherwise discriminated against Plaintiff because she complained about and opposed Defendants' discriminatory employment practices and investigated her rights with the CHRO.

124.    As a result of Defendants' retaliation, Plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial.  Plaintiff therefore is entitled to such affirmative relief as may be appropriate under Title VII.

125.    Defendant's acts and/or omissions were intentional, without cause, and were calculated deliberately and with malice or with reckless indifference to Plaintiff's federally protected rights so as to entitle Plaintiff to an award of punitive damages.


**COUNT FIVE -   CONNECTICUT WAGE & HOUR LAWS PROHIBTING
DISCRIMINATION IN COMPENSATION OF WAGES
(C.G.S § 31-75 et seq.)**

126.    Plaintiff repeats and realleges paragraphs 1 through 95 of the Complaint as if fully set forth herein.

127.    During Plaintiff's employment, Defendants required Plaintiff to perform the equal work as other male employees on jobs requiring equal skill, effort, and responsibility, and under similar working conditions at the same establishment.

128.    Defendants paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.

129.    By discriminating in the amount of compensation paid to Plaintiff on the basis of her sex, and by subjecting Plaintiff to discriminatory compensation decisions and practices, Defendants have engaged in a discriminatory practice in violation of the General Statues § 31-75 *et seq.*

130.    As a result of Defendants' discriminatory practices, plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial.  Plaintiff therefore is entitled to such affirmative relief as may be appropriate under General Statutes §§ 31-75 and 31-76, including attorney's fees and costs.

131.    Defendants' violation of General Statutes § 31-75 was intentional or committed with reckless indifference to Plaintiff's rights so as to entitle Plaintiff to an award of punitive damages.


## COUNT SIX - CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT
### (C.G.S. §§ 46a-60, et seq.) - DISCRIMINATION

132.    Plaintiff repeats and realleges paragraphs 1 through 105 of the Complaint, and paragraphs 119 through 125 of the Complaint, as if fully set forth herein.

133.    By discriminating against plaintiff on the basis of her sex, Defendants have engaged in a discriminatory practice in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), specifically C.G.S. §46a-60(a)(1).

19

134.    As a result of Defendants' discriminatory practices, plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial.  Plaintiff therefore is entitled to such affirmative relief as may be appropriate under CFEPA.

135.    Defendants' violation of CFEPA was intentional or committed with reckless indifference to Plaintiff's rights so as to entitle Plaintiff to an award of punitive damages.

## COUNT SEVEN - CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT (C.G.S. §§ 46a-60, et seq.) – RETALIATION

136.    Plaintiff repeats and realleges paragraphs 1 through 95 of the Complaint as if fully set forth herein.

137.    Defendants terminated and otherwise discriminated against Plaintiff because she complained about and opposed Defendants' discriminatory employment practices and investigated her rights with the CHRO.

138.    By retaliating against Plaintiff for complaining about Defendant's discriminatory employment practices and investigating her rights with the CHRO, Defendants have engaged in a discriminatory practice in violation of CFEPA, specifically C.G.S. §43a-60(a)(4).

139.    As a result of Defendants' discriminatory practices, plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial.  Plaintiff therefore is entitled to such affirmative relief as may be appropriate under CFEPA.

140.    Defendants' violation of CFEPA was intentional or committed with reckless indifference to Plaintiff's rights so as to entitle Plaintiff to an award of punitive damages.

## COUNT EIGHT – PROMISSORY ESTOPPEL

141.   Plaintiff repeats and realleges Paragraphs 1 through 95 of the Complaint as if fully set forth herein.

142.   By remaining in her employment with the Defendants, Plaintiff relied to her detriment on Defendants' repeated promises that she would receive a raise and a salary commensurate with her responsibilities as a human resources manager.

143.   Plaintiff's reliance on Defendants' promises was reasonably foreseeable.

144.   Defendants repeatedly breached its promises by failing to give Plaintiff a raise and by terminating Plaintiff.

145.   Plaintiff has suffered damages as a result of Defendants' failure to honor its promises.

146.   Injustice can only be avoided by the enforcement of the Defendants' promises.

## COUNT NINE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

147.   Plaintiff repeats and realleges Paragraphs 1 through 146 as if fully set forth herein.

148.   By the above acts, including but not limited to, demanding that Plaintiff travel and work early in the morning despite her need to manage and cope with her MS, Defendant intended to inflict emotional distress upon Plaintiff.

149.   Defendants purposefully took steps to make Plaintiff "miserable" in the workplace and created conditions that exacerbated her MS, caused her to suffer far more severe symptoms, and required adjustment of her medications in an effort to address her worsening condition.

150. Defendant knew or should have known that its conduct would cause the Plaintiff emotional distress.

151. The emotional distress inflicted upon Plaintiff was extreme and outrageous.

152. As a result of Defendants' actions, Plaintiff suffered, and continues to suffer, severe emotional distress and aggravation of her disability.

## COUNT TEN – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

153. Plaintiff repeats and realleges Paragraphs 1 through 146 as if fully set forth herein.

154. Defendant knew, or in the exercise of reasonable care, should have known, that its conduct toward Plaintiff involved an unreasonable risk of causing emotional distress and that the distress was severe enough that, if it was caused, might result in illness or bodily harm.

155. As a result of Defendants' conduct, Plaintiff suffered, and continues to suffer, severe emotional distress and aggravation of her disability.

**WHEREFORE**, the Plaintiff claims:

A.  Economic damages in the form of lost back pay, front pay, lost benefits, and other pecuniary losses, together with interest as permitted by law;

B.  Compensatory damages, including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

C.  Liquidated damages pursuant to 29 U.S.C. § 216(b).

D.  Punitive damages, pursuant to common law, 42 U.S.C. § 1981a, and Conn. Gen. Stat. § 31-76;

E.    Attorney fees and costs pursuant to 29 U.S.C. § 216(b), 42 USC § 2000e-5, Conn. Gen. Stat. § 31-76, and Conn. Gen. Stat. § 46a-104;

F.    Other affirmative relief if necessary to eradicate the effect of Defendants' unlawful employment practices; and

G.    Any other relief that the Court deems reasonable and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.

PLAINTIFF
CHERYL VERDONE


By: /s/ David A. Slossberg
David A. Slossberg (CT13116)
Meaghan M. Ehrhard (CT29793)
Hurwitz, Sagarin, Slossberg & Knuff, LLC
147 North Broad Street
P. O. Box 112
Milford, CT  06460-0112
Telephone: (203) 877-8000 / Fax: (203) 878-9800
DSlossberg@hssklaw.com
MEhrhard@hssklaw.com

23

## CERTIFICATION

I hereby certify that, as required by General Statutes § 46a-103, a copy of the Complaint was sent to the Connecticut Commission on Human Rights and Opportunities by emailing a copy addressed to ROJ@ct.gov.

/s/ David A. Slossberg
David A. Slossberg